May it please the Court, I am Mary Kay Fowler, representing Ms. Sharon Bencic in this Social Security Disability Claim. I would like to reserve a few minutes for any rebuttal. Ms. Bencic is a person of advanced age who experienced some low back injury that prevented her from a high school education and has prior relevant work as a line cook and a banquet waitress. All of those facts put under the Social Security grids, otherwise known as the CRF 20 CRF 404-1599 subpart P, appendix 2, section 201-10, that she is disabled. Can I ask a question? The ALJ decides she wasn't disabled and he based it, I think, on at least two spine doctors who seemed to conclude that she wasn't disabled. And why can't that be substantial evidence? Because those spine doctors didn't find that she was disabled. He based them on... No, you want to say those spine doctors did not find that she was not disabled. Correct. Those spine doctors were reviewing Ms. Bencic's physical, had a physical exam for her. They were under the, they were purchased or therefore the social, excuse me, for the worker's comp insurance carriers to determine if she did experience an injury that should be covered under worker's comp. So their summaries were based really on indicating whether this case, whether her injury was or was not worker's comp. Dr. Maxwell, one of the spine experts that the ALJ points to, his opinion is, says, from an injury point of view, and he frames that in his opinion, she can return to her pre-injury employment without restrictions. He's simply telling the worker's comp insurer, you don't need to pay for this injury. This was degenerative disease. It was not an event at work that caused her to have us pay for any loss of earnings or any issues related to that injury. I guess I don't understand exactly what I was reading. Because it seemed to me Dr. Hurley said, never more than 10 pounds and multiple work restrictions. Dr. Hurley is her treating and I understand. I'm just trying to conflict now these. Now we got the three examining spine specialists. Dr. Maxwell says, no work restrictions at all. From an injury Just a minute. Dr. Weiner says, 5% impaired and could lift over 10 pounds occasionally even before he learned she misrepresented her medical history. He said that. And Dr. Traynor said, no specific work restrictions. She will not tolerate going to work, but no anatomical reason for it. The Dr. Traynor's opinion is a message to the worker's comp that the injury is not related that her disability is not related to a work injury. He said, Dr. Traynor said, I do not believe that she will tolerate a return to work due to the complaints and the severity of her back pain. That is putting her at less than light in a sedentary category, supporting of her gritting out. Dr. Weiner limited her to 15 to 20 pounds, which puts her at a sedentary rate, a sedentary capacity, which again puts her in a grits with her age and education and prior work. My problem is you keep saying, every time they say no restrictions, you're saying that's just for worker's comp, but then when you like their limits, you say the ALJ should be able to rely on them. I don't know whether you, do you think overall the ALJ can use what Maxwell, Weiner, and Traynor say even if it was in a workman's comp context? Those spine surgeons are framing, the information they're giving that you're gathering from their reports is whether she can return to her previous work or whether worker's comp should pay for what she believes is a work injury. Their limitations also support that she is at less than a light work or not able to go back to her light work. I found these things kind of confusing. I don't know what due to complaints and severity of her back pain means. Does he, does he mean her complaints are subjective and not based on anything and she could really work, but severity of her back pain sounds like she can't work. So that confuses me. There's a couple of things I really don't understand. What does not stationary mean? Not stationary means that you, that that person has not been deemed by worker's comp to be at their maximum medical improvement. So there may be interventions that can be obtained that maybe could make a change in their current work function or their current functionality. Now let me ask you this. She was getting shots, she could get, or she did or could get shots in her spine that were epidural shots? Yes. And I don't understand why that's conventional treatment. Well I, I agree with you. I consider it rather, I mean it's invasive. I mean there's a needle. You are a sedated, so. More than a steroid shot in your knee. Well yes, but it's next to the spine. So. So it's. So I consider it more than conservative. There are a lot of. It's used all the time. It is used a lot because it can have some positive results and is probably one of the more, you know, there's a lot of people, like in her case, she's not a surgical candidate. Whatever they can do surgically is not going to help her. So the other alternative is to do these epidural injections. Okay. Now that I've got all my back questions answered, with all this stuff going every which way, why can't the ALJ do what he did if there's stuff going every which way? Because the ALJ is misinterpreting what the information from workers' comp, what the workers' comp claim is. It's apples and oranges. Workers' comp is sending her to these spine specialists to say, do we have to pay for her medical care? Do we have to pay for her epidurals? Do we have to pay for her medications? And the workers' comp people are saying, she has a degenerative disc disease. Her, she's had her disease a while. It has gotten worse. They all say she's impaired. And, but, but, but you as a workers' comp and carrier, insurance carrier, do not have to pay for this because it's degenerative. So that is the confusion that the ALJ was, was victimized by. The ALJ, the result of this is that they said she could return to her prior work. And her prior work was as a waitress? Is that right? She had some prior work as a waitress and she worked as a cook also. So both of those work are by the Department of Occupational, Dictionary of Occupational Titles, fall at least at light. So she was doing at least light, maybe even a little heavier work. Those guys were never waitresses and cooks. Exactly. Exactly. So the fact that she can carry only 10 pounds and can't be on her feet, a waitress or a cook needs to be on their feet a minimum of six hours a day. She cannot do that. Dr. Hurley says she can't do it. Dr. Weiner says she can't do it. And Dr. Traynor says he doesn't believe she can do it because of the severity of her disease and her complaints of pain. Dr. Maxwell said from an injury point of view, so the workers' comp people don't have to pay for her problem. He did indeed put her off work for another four weeks. He filled out a form that said, well, stay off work for four more weeks. So which is his way of, you know, I can look at that and say he did believe she had serious disease and that her MRI revealed serious disease, her pain. Dr. Hurley, her treating physician, you know, consistently saw the pain, the numbness, the tingling, the weakness, and her decreased range of motion, all those things to support. And like many people with degenerative disc disease, she was moving along, working, working. An incident happens. She's no longer able to continue her work. And that puts her at the, you know, grids her out at a sedentary work because she can't be on her feet that long to do what she's done before. What the AOJ did was really base his opinion on Dr. Simpson, the non-examining, non-treating doctor, who presumably looked at all the records and knows why he's evaluating this and comes up with a recommendation that she can return to light work. And I think, what do you want us to do with that? Well, you say the operative word there, Your Honor, is presumably. The only records that they actually, that the non-examining person cites to is that, is a statement that says that she was released to return to her work and that being on temporary total disability, which is another workers' comp term for you are off work, is an issue reserved for the commissioner. So it's really unknown what records they reviewed. And as a non-treating and non-examining individual or provider, they should be trumped by the treating and the examining providers under the Social Security's own regulations. So we're really, it seems to me that what you're arguing is, we're really have to take what the ALJ suggests are actually, if you will, disagreements with the treating physician and disagreements that are pretty major with the treating physician and say, well, the they weren't saying what the ALJ is writing down here. The fact that the ALJ says that the differences to the worker conditions, restrictions, what the doctors were suggesting is, well, this was just a work comp determination. So we couldn't use those. When we look at what Hurley says as to the radiculopathy and what the, what the, what the, what the, what the specialist said, no radiculopathy, and Gutskill said, time symptoms are vague and not consistent with apparent capabilities, that again, that's just, they were saying that for something different, and therefore the ALJ can't rely on it. Because we're really going back to the bottom line question. The ALJ can get rid of what the treating physician says as long as, the rule would suggest, he says this is where they were wrong with what I've seen otherwise, and these are our basis. And all you're saying is he shouldn't have used that because it was a different analysis. I'm saying that the ALJ erred because he misinterpreted the information. He's looking at legal jargon, if I can use that word, that these spine specialists are putting out there, because they were paid by a workers' comp insurer to review the case and decide whether she should be paid. All of those spine specialists said she has spine disease, and two of the three said she had limitations that she could not return to work. I don't know, some of them said she had no anatomical indications. I don't know, how can you say that? When there is a compression of an exiting nerve root, and it pushes on that nerve root like a sciatic pain, that's probably the one that's most, the common vernacular, then they are a surgical candidate. Because a surgeon can go in there, open up the area around that spinal nerve root, and then give that nerve, release the compression on that nerve root. That, as spinal surgeons, that's what they're looking for. We can go in there and fix this lady, but she isn't that kind. She has compression of a nerve root, but it's not the kind that is surgical. And all of the spine surgeons said, if we did surgery, it would not help her, it would probably... You say, when they say no anatomical indications, all they mean is she's not a surgical candidate? She's not a surgical candidate for... It sounds like a rather limited interpretation of those words. I would think that anatomical indication would be swelling, unevenness of gait, bent over. Aren't those things anatomical? Well, I think those are physical things that are observed, or would be called objective findings. Isn't compression anatomical? Pardon me? What is compression? That isn't anatomical? If it's compression, you know, from the anatomy, such as the, in her case, the herniated disc that is pressing against her nerve root, her L1, then that is anatomical. Well, but I'll be fair, I appreciate your answers here, but when I read what Dr. Treanor said, when he said no specific work restrictions, and then he said it like this, she will not tolerate going to work, but no anatomic reason she can't, it seemed to me like he was saying, she says a lot of stuff, but we can't find any reason to agree with her. I feel... On an objective basis, that's what that said to me. He is telling his workers' comp insurer, you do not have to pay for this, there's not an anatomical reason, although he's, and then he's not, he's not making a decision for Social Security to say, you know, what she can or cannot do, but he's saying that it is unlikely she can return to her work with this disease. Who's the one who observed her jumping on and off of the examining table with no problem? Well, the ability to get on and off an examining table... With no grimace, no nothing, just hop on up there. Miss, the grids allow her to do sedentary work and still be found disabled. That's in the record, right, what I just said, although they probably didn't say hop. So that's something the ALJ can consider, correct? Yes, the ALJ can consider that. But in isolation, it's just, she's not, she doesn't have to be bedridden, she doesn't have to be housebound. She just has to be limited to a less-than-light or sedentary finding, and the spine specialists and her treating doctor all found that. All right, your time has expired, thank you. We'll hear from the Commissioner. May it please the Court, my name is James Burgess, I'm appearing this morning on behalf of the Acting Commissioner of Social Security. As the Court has noted, the real issue in this case are the three opinions of the spinal specialists, all of which contradicted Dr. Hurley, the treating pain management specialist's opinions. All right. I think there's enough in this record for the ALJ to basically do what he did. I'm not sure what he based his decision on. That's my problem. He was a little vague about what he was doing and where he got the specific poundage things. So why don't you tell me where he got the specific poundage things and how I find that in his opinion? Certainly. The ALJ discussed all of the medical opinions as well as the rest of the evidence. Residual functional capacity, what you're talking about, how much the claimant can lift, how much she can carry, how long she can walk and sit and stand, all of those things are based upon all of the evidence of record. That's really clear within the law and the regulations. The ALJ discussed those things and discussed the weight. He was providing different things, for example, discounting the claimant's credibility and then giving the various weight to the physicians. It comes up with the weight, but he doesn't say where he got that. And I was thinking, well, maybe he got it from something that said no restrictions. But she said the no restrictions thing has to do with workman's comp. So get out of this mess for me and tell me what the answer is. The ALJ's residual functional capacity assessment does mirror the state agency physician's opinions. The ALJ did not explicitly state that's what he was premissing it upon, but that is a clear inference that we can make here based upon the correlation between those two things. However, the ALJ also gave weight to the opinions that, as has been discussed, Ms. Binsett could return to her pre-injury work without any restrictions. Her pre-injury work included work as a waitress, which is what the ALJ found she could do at Step 4, thus consistent with that opinion. Dr. Treanor said he could find no anatomic basis for her complaints. And I believe what the Court suggested was a reasonable reading of this is the reasonable reading of this. She complained of a lot, but Dr. Treanor just could not find the objective evidence to back that up. She was able to walk with a normal gait, get on and off the examination table, negative straight leg raising. All in all, that could be read as no restrictions. And I do take issue with the assertion that this, that she saw Dr. Treanor for workman's comp. I don't see any evidence of that in the record. Dr. Hurley had sent her to Dr. Guttgesell, I believe is the pronunciation, for injections. When Dr. Guttgesell said injections were not working, we should send her on to Dr. Treanor, who is a spine surgeon, to determine if surgery is the appropriate next step. Well, what does Dr. Treanor mean when he says, no reason to discontinue work, I guess entirely. I do not believe she will tolerate returning to work due to the complaints and severity of her back pain. Severity of her back pain. So Dr. Treanor says, she's got severe back pain. She released reports of severe back pain, but I believe that next sentence really is the clarifying part there. I can find no anatomic reason for that. And when then you look at, again, the other opinions also. So the sentence really meant due to the complaints about severity of her back pain, as opposed to complaints and severity of her back pain. Well, I think that is a reasonable reading of this in conjunction. Looking at those two sentences together, I think that is a reasonable reading, and the reading the ALJ appears to have taken. And what about Dr. Maxwell, when he checks the box, no work? What does that mean? And that was the other issue that we did discuss here. I think the ALJ reasonably relied upon the concurrent written statement versus this checkbox form, which we don't know if that means she was not currently working. Because in the narrative statement, Dr. Maxwell clearly said she is stationary. She can return to her work. And those things seem beyond question. I thought he said from an injury point of view. That is correct. That is correct. And I do believe that is probably in relation to the work compensation. I believe that is a reasonable reading of that. So from an injury point of view, she is not fixed in her recovery. She is not stationary. You agree with that? That was your opposing counsel's view of what stationary meant. No, I mean, again, looking at... So what do you think stationary means? And I don't practice workman's compensation, I'll be honest, and so I don't know how that statement in conjunction with the remainder of Dr. Maxwell's specific statements about what Ms. Binsick could do, he appears to believe that she did not have any anatomic reason to not go back to her prior work. In addition to these three opinions, you have the objective evidence. We have in the record two x-rays and one MRI. All of them certainly showed issues with Ms. Binsick's lower back, no doubt about that. However, the three spinal specialists who reviewed those objective studies all... What are the issues with her back? I believe a disc bulging and an annular tear within the... Those sound anatomic to me. So it sounds like the MRI disagrees with the doctor who says there's no anatomic. Those sound anatomic. I think, again, a reasonable reading is that the anatomic evidence does not support the extremity of her complaints. Not that they don't support anything, it does not support the extremity of those complaints. Because again, those three doctors, all of whom looked at these studies, said no anatomic evidence that she has significant issues. She could return to her past relevant work or that she could do a range of sedentary to light work in the case of Dr. Weiner. To what extent does the ALJ's opinion depend on adverse credibility determination? That was an issue that Ms. Binsick did not argue either before the trial court or this court, so it's waived. However, I did bring that up in our briefing because it appears that the ALJ based the RFC analysis, at least in part, upon adverse credibility finding. And to some extent, Dr. Hurley's opinion would have to be at least partially based upon her subjective complaints. The ALJ discussed immediately above Dr. Hurley's opinion Dr. Weiner's notation that Ms. Binsick had not been totally honest with him or Dr. Treanor. Then the ALJ discussed Dr. Hurley's opinion, noting inconsistent with the record as a whole, not supported by objective evidence. And then the ALJ made the finding about the lack of credibility. Dr. Hurley could really only be based on this upon the objective evidence and her subjective complaints. Those are really where physicians must get their opinions of patient's limitations. The ALJ found, consistent with these specialists, the objective evidence just did not support. So thus, subjective complaints had to play a large role in this. In order to prevail, do you think she has to overcome that adverse credibility finding? I believe that's more of a side note in this case rather than the direct point, Your Honor. Can I get the picture here? Because of her advanced age, which is way younger than me, if she cannot return to her prior job, then she would get benefits. That is not correct, Your Honor. Oh, that's not correct. Okay. No. So there's the five steps of control evaluation. So what happens here if there's a finding at step four that she can't return to her prior job because she can't lift the 20 pounds? The ALJ would go on to step five. There would be discussion, usually with a vocational expert, because here, well, actually there are no real non-exertional limitations beyond the postural, so maybe not even requiring a vocational expert could just compare it to the Dictionary of Occupational Titles and see whether an individual with that RFC could perform jobs existing in significant numbers in the national economy. Usually you'd call in a vocational expert. But I thought there was this grid thing and she has a low education level. I think your opposing counsel was speculating that there was no way she's going to qualify for any of this other work. And that's incorrect, because to meet the grid rules, the medical vocational guidelines, you have to exactly match each of its criteria. And here, the big issue that we pointed out is even if the court found that she was limited to a sedentary RFC, which the only opinion of that is Dr. Hurley's, which, as we discussed, is reasonably given little weight, she would also have to have no transferable job skills in order to, let me say, grid out under the medical vocational guidelines. Because the ALJ never got to Step 5, there's been no vocational testimony in this case about whether Ms. Bintuck has any transferable job skills. Her past relevant work was, I believe, all semiskilled work, so it is entirely possible that there would be transferable job skills. We just don't know based upon this record. Kagan. Ginsburg. Your view is if you lose, you have to go back for further proceedings. That's correct, Your Honor. That's correct. Just because there's insufficient evidence for this court, even under its credit as true rule, to find that Ms. Bintuck would grid out on this record. So if we did not agree with you as to the doctor, we did not agree, then it would seem to me you're suggesting that the ALJ's determination at Step 4, if we don't agree with you as to the doctor, that they should have accepted the doctor's treating physicians, and they didn't do enough to get rid of the treating physician, where are we left then? Even then, a remand is the appropriate remedy. Because if you say that the ALJ gave insufficient reasons for discounting Dr. Hurley's opinions, the proper remedy under the Supreme Court's ordinary remand rule is to remand to the agency to deal with that inconsistency, especially whereas here you have so much evidence that contradicted Dr. Trainor's opinion. Again, the clinical observations is notable. You mean Dr. Hurley's opinion. Excuse me, Dr. Hurley's. Thank you. Dr. Hurley's opinion. The clinical observations of Dr. Trainor, Dr. Maxwell, Dr. Weiner, as well as the consultative psychologist, Dr. Ribera, who noted that even though Ms. Bintuck said, I'm experiencing pain at a level of 6 of 10, there were no overt pain behaviors, she had no difficulty with agility or mobility, which is, again, consistent with these other providers. Well, that's the reason. It seems to me we have two ways to go here. We could say, you're right. We could say, no, the ALJ didn't do enough with the doctor, and that's where you are. Or we could say, well, even doing as much with the doctor, the ALJ still erred in not determining this disability under Step 5, right? Well, again, we only get to Step 5 if, again, you say the ALJ gave insufficient reasons for discounting, which, again, I really disagree with here, because there is so much evidence for this. I know you disagree, but I'm just trying to get all the alternatives out there. So, I mean, if you find that, then the ALJ's Step 4 finding would not be supported by the current evidence in the record, and a remand would have to be the remedy for review of the RFC in comparison to other jobs at Step 5. Well, we could either send it back to redo Step 4, because we thought, well, he's got stuff, but he hasn't really explained what he's doing. Or we could say, he really erred at Step 4, and she should have been listed disabled, and then we say, go to Step 5. I understand you think he did enough, and we should just say, Step 4, she lost at Step 4, and so she's out. Yes, and normally what would happen, if it goes back, the judge would do a whole new decision, the ALJ would do a whole new decision, look at it all over again, and then, if appropriate, go on to Step 5 in the sequential evaluation. I see. Okay. So, unless the Court has any further questions, I would take my seat again. Thank you. Thank you. I think he didn't exceed his time, and you did, so I think we'll go on. I think we understand your argument. So, Case 1315295, Bencik v. Colvin is submitted.
judges: Restani, Schroeder, Smith